JAMES T. BURTON (Utah Bar No. 11875)
*jburton@kmclaw.com*
JOSHUA S. RUPP (Utah Bar No. 12647)
*jrupp@kmclaw.com*
**KIRTON | MCCONKIE**
Key Bank Tower
36 S. State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Facsimile: (801) 321-4893

Mark W. Romney*
(Texas Bar No. 17225750)
*mark@romneylawfirm.com*
**ROMNEY LAW FIRM**
900 Jackson Street, Suite 750
Dallas, TX 75202
Telephone: (214) 329-4237
Facsimile: (214) 329-4257
**Pro hac vice* application forthcoming

*Attorneys for Plaintiffs TradeWarrior, Inc.*
*And Damon Deru*

---

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| TRADEWARRIOR, INC., a Nevada corporation, and DAMON DERU, and individual,<br><br>Plaintiffs,<br><br>vs.<br><br>INVESTMENT GRADE TECHNOLOGIES, LLC d/b/a ORANJ, a Delaware limited liability company, ADVISERS ALPHA, | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br>Case No.: ________________<br><br>Judge: ______________________<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| LLC, a Delaware limited liability company, DAVID LYON, an individual, PERRY MOUTZOUROS, an individual, and John Does 1-10,<br><br>Defendants. | |

Plaintiffs TradeWarrior, Inc. ("TW") and Damon Deru ("Deru") (collectively, "Plaintiffs"), by and through counsel, hereby complain and allege for their complaint against Defendants Investment Grade Technologies, LLC d/b/a Oranj ("IGT"), Advisers Alpha, LLC ("AA"), David Lyon ("Lyon"), Perry Moutzouros ("Moutzouros"), and John Does 1-10 (collectively, "Defendants" unless otherwise specified) as follows:

**PARTIES**

1. Plaintiff TW is a Nevada corporation with its principal place of business in the State of Utah. TW is a member of AA and, prior to becoming a member of AA, developed a software product marketed under the name TradeWarrior.

2. Plaintiff Deru is an individual residing in the State of Utah, a principal in TW, and is TW's President; Deru is a manager of AA.

3. On information and belief, Defendant IGT is a Delaware limited liability company with its principal place of business in the State of Illinois. IGT is also a member of AA.

4. Defendant AA (sometimes also referred to as the "Joint Venture" or "JV") is a Delaware limited liability company with its principal place of business in the State of Illinois but with an office located in the State of Utah.

5. On information and belief, Defendant Lyon is an individual residing in the State of Illinois. Lyon is the owner of IGT and a manager of AA.

6. On information and belief, Defendant Moutzouros is an individual residing in the State of Illinois. At all relevant times, on information and belief, Moutzouros has been the Chief Technology Officer for Defendant IGT.

**JURISDICTION AND VENUE**

7. The Court has subject matter jurisdiction over this lawsuit under at least 18 U.S.C. § 1962, *et seq.* (Racketeer Influenced and Corrupt Organizations Act ("RICO")), 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

8. The Court also has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1332 where the Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has general and/or personal jurisdiction over each of the Defendants inasmuch as the Defendants either regularly transact business within this District or the Plaintiffs' claims against the Defendants arise out of Defendants' actions and omissions within this District.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (3) as this District is where a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of this action is situated, and one or more of the Defendants are subject to the Court's personal jurisdiction. Venue is also appropriate in this Court pursuant to 18 U.S.C. § 1965(a).

**GENERAL ALLEGATIONS**

11. As mentioned above, Deru is a founding member and principal in TW, which developed and marketed the TradeWarrior software product, an innovative and successful investment trading and rebalancing product built for the Registered Investment Advisory (RIA) industry and sold throughout the country.

12. Lyon is the owner of IGT, a company generally operating in the same industry as TW. IGT developed and markets another financial services industry software product under the tradename Oranj.

13. Deru and Lyon first started talking about the possibility of working together in February, 2015, when a mutual industry contact first introduced them to each other. Nevertheless, discussions did not get serious until July and August of 2016, when Lyon discussed the possibility of IGT acquiring TW. Even then, initial discussions ultimately fell apart owing to Lyon / IGT's low valuation of TW and its assets.

14. In January 2017, Deru contacted Lyon to see if Lyon / IGT were still interested in acquiring TW. Lyon responded that he was interested, but, instead of acquiring TW, Lyon proposed forming a joint venture to, in Lyon's view, most effectively collaborate on the parties' mutual strengths and interests in developing software products for the financial services industry, and specifically to co-develop and market a new investment software program to be sold under the tradename "MAX."

15. In connection with their subsequent discussions *circa* January 2017 and continuing thereafter, Lyon represented to Deru and other TW employees (namely Janson Evans

and Darren Collins) during the mutual investigation / due diligence period that IGT was a large and successful company with over 1,700 clients / customers and annual revenues in excess of $2.5 million. These representations were made in person by Lyon to Deru and Janson Evans in their Utah offices during a due diligence meeting in March 2017. These representations were false at the time they were made. On information and belief, Lyon knew these representations to be false but deliberately made the same to fraudulently induce TW to consider and ultimately enter the JV.

16. Beyond the above-identified false representations, Lyon also reported IGT as having $198 billion in Assets Under Management ("AUM"), which later proved to be a demonstrably gross exaggeration of the truth. These false representations were also knowingly made to fraudulently induce TW to consider and ultimately enter the JV.

17. In addition, during the course of Lyon / IGT and Deru / TW's negotiations, and to bolster Lyon's false claims of IGT's alleged success, on information and belief Lyon personally funded IGT's lavishly furnished and decorated Chicago offices complete with a large and seemingly busy staff. On a due diligence trip Deru made to the IGT offices in Chicago during January 2017, TW was led to believe that these appearances were the trappings or fruits of IGT's industry success. But these appearances were false and misleading; in reality, Lyon was personally funding the same as part of his scheme to fraudulently induce TW to consider and ultimately enter the JV.

18. Likewise, throughout the due diligence process, between January and April 2017, Lyon and Moutzouros also made numerous false statements to Deru and Darren Collins

concerning the existence, status, and functionality of IGT's software product, Oranj. For example, during negotiations, Lyon and Moutzouros, IGT's Chief Technology Officer, expressly represented the following, each of which was knowingly false at the time it was made:

- Oranj's "Docusign" integration was done;
- Oranj had a functioning API (Application Programming Interface, a portal facilitating communication between a given software program and other 3rd party software programs so that two or more software programs can work together.);
- Oranj's "Account Aggregation" was working perfectly with multiple vendors;
- IGT was almost done adding in a "Goals" feature to their Oranj software product; etc.

Nevertheless, after the JV was eventually entered, TW learned, for the first time, that none of the foregoing representations were true. Worse, these misrepresentations cost the Joint Venture extremely valuable time and resources as the JV development team had to divert significant time and resources to building Oranj functionality that TW was led to believe had been finished prior to forming the Joint Venture rather than spending those same resources developing MAX. Ultimately, Oranj's Docusign integration was not finished until approximately July 2017. And, on information and belief, Oranj still does not have an API developed by IGT. Instead, to Plaintiffs' knowledge, the current API is the one TW brought to the Joint Venture. Further, on information and belief, Oranj's Account Aggregation still does not work properly and Goals was only added around mid-August 2017.

19. In March 2017, as the parties were continuing to negotiate the terms of the JV deal, Deru proposed to Lyon that IGT acquire TW outright (as opposed to a dual-company or joint venture arrangement) as that would significantly simplify the deal as well as the subsequent

management of the JV. Lyon, however, insisted on a dual-company structure comprised of two separate entities: IGT, on the one hand, and TW on the other. Specifically, Lyon falsely responded that a straightforward acquisition would not work because IGT had significantly more revenue than TW and therefore TW would have a very small equity stake in the company. To this end, Lyon professed that a dual-company structure would work to TW's specific benefit in the form of a sizeable equity stake resulting from IGT's comparative size and level of success. On information and belief, Lyon ostensibly pushed for the two company structure in order to preclude TW from conducting further due diligence of IGT's actual customer base and revenue stream—both of which had been consistently and knowingly misrepresented throughout negotiations and the due diligence process.

20. Lyon's above-referenced pre-Joint Venture representations were fraudulent in that they were false, and knowingly and intentionally made for the purpose of deceiving TW and Deru and fraudulently inducing TW and its owners to enter into and form the Joint Venture with IGT.

21. Beyond his direct and deliberately false representations to Deru and TW, Lyon also knowingly published similar false and misleading representations in press releases, industry publications, and industry speaking engagements (on at least April 24, 2017 in *Wealth Management Today* (claiming 1,800 clients), November 17, 2017 in *Investment News* (claiming 2,100 clients), October 11, 2016 in *Built in Chicago* (claiming 225% growth), and March 25, 2015 in *Ezra Group*, both before and after the Joint Venture was formed) in which he falsely represented that IGT had thousands of customers.

22. On information and belief, Lyon's false and material misrepresentations routinely made in press releases, industry publications, and industry speaking engagements form part of Lyon and IGT's broad, multifaceted and predetermined ongoing scheme or artifice to defraud and mislead Deru, TW, and other industry participants, including, *inter alia*, fraudulently inducing TW and its owners to enter into and form the Joint Venture with IGT on the basis of artificially inflated and inaccurate performance metrics, product development, and so forth.

23. On information and belief, owing to the foregoing misrepresentations, Lyon refused to allow Deru and TW to examine IGT's accounts, books, clients, revenues, etc. during the due diligence period. In so refusing, Lyon contended that because the parties were contemplating a Joint Venture rather than an acquisition, Deru and TW had neither the right nor the need to examine IGT's accounts, books, clients, revenues, etc. prior to forming the Joint Venture.

24. Ultimately, Deru and TW relied, to their detriment, upon Lyon's false statements, along with Lyon's misleading press releases, industry publications, industry speaking engagements, and a lavishly furnished offices with a large staff and were falsely led to believe that Lyon had built a successful and profitable technology company. Indeed, in reliance upon Lyon's false statements made both directly to Deru and other TW shareholders and employees, as well as other industry participants, TW entered into the Joint Venture with IGT on April 13, 2017. More specifically, based on terms for the Joint Venture's formation negotiated between January and April 2017, the Limited Liability Company Agreement of Advisers Alpha LLC (the

"Agreement") was executed on April 13, 2017, under which IGT and TW became 51% / 49% members in AA and Lyon and Deru became co-managers of AA.

25. Contrary to Lyon's pre-Joint Venture representations, but only *after* the JV was formed, several of IGT's employees, including Jodi Lombard ("Lombard") (who oversees IGT's accounting and billing), revealed to TW employees Deru, Janson Evans, and Patrick Keel during May/June 2017 that IGT *only had 17* (<u>not</u> 1,700 plus) paying clients, and that IGT had very little revenue. Greg Sauer ("Sauer") (head of sales for IGT), George Jacob (salesman for IGT), and Wendy Overly (an IGT accountant) also confirmed these actual client numbers to TW employees *after* the JV was formed.

26. Lyon's false material misrepresentation of 1,700 plus customer accounts (among other false representations) was significant to TW inasmuch as TW had been told and otherwise understood that, in concert with formation of the JV, TW would be entitled to cross-market its existing TradeWarrior software product very profitably to all of IGT's allegedly-existing accounts. Indeed, had Lyon's representations been true, access to 1,700 or more new customer accounts would have been a very profitable opportunity for TW.

27. Beyond a large new client base to which TW could market its TradeWarrior software product, Lyon's misrepresentation further fraudulently induced TW to enter into the JV on the belief and understanding that IGT's significant alleged accounts would provide a large existing client base to sell the JV's intended MAX product to as well.

28. Likewise, as discussed above, it was only *after* the JV was formed that Deru and TW learned, for the first time, of Lyon's other false representations, including, *inter alia*, the

overstated status of IGT's Oranj product development and features, the fact that Lyon was personally funding IGT's offices and staff, the relative value of the equity interest TW was going to contribute to the JV compared to the misrepresented contribution by IGT to the JV, etc.

29. For example, as briefly discussed above, in May, 2017, *after* closing the transaction and forming AA, TW became aware—for the very first time—that the Oranj software functionality Lyon and Moutzouros had shown and represented to TW during the due diligence process, in reality, consisted of only screen-shots and wire frames (a screen layout of the proposed functionality of a website or software product used to show how the program will eventually work but which are nothing more than design mock-ups with no data or actual functionality) deliberately and fraudulently designed to portray or demo features that did not actually exist at all, but were only in the initial planning stages. Indeed, there were very few completed functions or routines that could be ported from IGT's Oranj product into the JV's new MAX product. As mentioned above, this falsely represented set of facts cost TW and AA valuable time as the JV was entered into with the intention of producing MAX using joint contributions of comparable value and functionality from both IGT and TW; AA instead had to build functionality Lyon and Moutzouros had represented to already exist. Moreover, rather than being able to capitalize on joint contributions, only about 10% of the code for what is now MAX comes from IGT code that existed before the formation of AA. And, on information and belief, IGT's ported code contributions do nothing more than facilitate or support 5 or 6 remaining former legacy users / clients of IGT. In short, IGT's pre-JV contributions do nothing for the benefit of the new MAX product and are not used for new MAX sign-ups. In fact, the entire

architectural framework that MAX runs on was developed by TW before the JV. On information and belief, as the current code base stands in MAX, IGT did not contribute any functionality which existed before the JV. Only *after* the JV was formed was anything completed by the IGT employees for MAX, but was paid for in large part from the AA budget.

30. Likewise, pre-JV, IGT did not have an API or any micro services (simple dedicated tasks performed within a software program to functionally support an API in returning specific pieces of data, calculations, etc. for program scalability) developed. And after the JV, IGT dropped its existing architectural plans altogether, instead opting to use the architecture and authorization service (a micro-service that authenticates a user and issues a "security token" or electronic key to allow that user to access software functionality) that TW had built into the TradeWarrior product prior to the JV.

31. As a further fraudulent inducement to entice TW to enter into the JV with IGT, Lyon also repeatedly misrepresented, *inter alia*, that

- he and Deru were, in essence, to be 50 / 50 business partners in the JV;
- Oranj and TradeWarrior would remain separate software products; and
- Deru would be allowed to run the TW division of AA with autonomous discretion and independence.

Nevertheless, Lyon insisted on a 51% / 49% ownership split between IGT and TW to allegedly prevent deadlock. Lyon also insisted that IGT have majority control solely because Lyon was contributing capital to the JV. Deru proposed creating a Board of Directors prior to the JV in March 2017, but Lyon rejected this proposal, representing that Lyon and Deru would jointly make *all* decisions for AA. Indeed, this precise arrangement is embodied and memorialized in

Section 14.2 of the final executed JV Agreement. Nevertheless, shortly after the deal was signed, it became clear to Deru that Lyon had no intention of treating him like a 50 / 50 business partner; Lyon instead generally made all major business decisions for AA entirely independent of Deru's knowledge or consent, as outlined in more detail below.

32. Even though IGT kept a controlling 51% ownership interest in AA, the parties specifically agreed upon a buy-out or break up provision for situations in which a material disagreement could not be resolved by the members of AA, which is found in Section 15.4 (discussed in more detail below) of the Agreement.

33. Notwithstanding Lyon's numerous representations that Oranj and TradeWarrior would remain separate software products post-JV, in the Fall of 2017 IGT stopped attempting to sell its separate Oranj software product altogether. At the same time, during an October/November 2017 company management meeting with Deru, Lyon, Moutzouros, Lombard and other IGT employees present, Lyon unilaterally proposed a plan to merge the TradeWarrior software into AA's new MAX product and entirely cease selling TradeWarrior as an independent and separate product. Deru opposed Lyon's unilateral plan inasmuch as it was (a) contrary to Lyon's express promises and representations which induced TW to enter into the JV, (b) contrary to the best interests of AA, and (c) contrary to the interests of existing TradeWarrior clients. Nevertheless, in breach of his fiduciary obligations, Lyon went ahead, unilaterally moving forward with implementing his plan over and irrespective of Deru's objections.

34. Following the formation of AA, but contrary to his obligations as a fiduciary of AA, Lyon began executing new agreements with AA customers to utilize the co-developed

MAX software product solely in the name of IGT, not AA, despite MAX being the co-owned product of AA. One such agreement was entered between IGT and Frost Investment Advisors *after* AA had been formed. This was done without the knowledge or consent of Deru. Moreover, Lyon unilaterally removed Deru's ability to see communications with numerous asset managers (including, but not limited to, Frost Investment Advisors) in AA's customer relationship management software program (CRM) in an attempt to conceal and obscure Lyon's surreptitious activities and communications with the asset managers. On information and belief, discovery will reveal additional agreements entered by Lyon solely in the name of IGT after the formation of AA. Greg Sauer, head of sales for IGT, was also heavily involved and aware of this activity.

35. Lyon and IGT's misrepresentations and deceptions that fraudulently induced TW to enter into the JV thus continued after the JV was formed. Such misrepresentations and deceptions are likely to continue absent injunctive relief from the Court. Indeed, on information and belief, misrepresentations and deceptions constitute Lyon and IGT's regular way of conducting and doing business.

36. Continuing in this pattern, Lyon subsequently removed Deru's access to other clandestine agreements that Lyon had executed on behalf of, and for the sole benefit of, IGT, which should have been AA agreements. In addition to Frost Investment Advisors, these include, on information and belief, agreements with several major asset management firms, including ETF Securities, Wisdom Tree, Blackrock, Oppenheimer, Vestmark, SpiderRock, and Morningstar. Further, after Lyon later unilaterally and improperly terminated Deru's employment with AA (discussed in more detail below), Lyon continued to pursue relationships

with several other asset management firms solely on behalf of, and for the benefit of, IGT, not AA. On information and belief, discovery will reveal the full extent of Lyon's efforts in this respect.

37. Notwithstanding Lyon's attempts to conceal the foregoing, Deru discovered IGT's agreement with Frost Investment Advisors in September 2017. After Deru confronted Lyon with the issue of improperly taking AA revenues and opportunities for IGT, Lyon represented that the contracts were signed in IGT's name due to pre-existing agreements with ByAllAccounts ("BAA"), a vendor IGT uses for data feeds. Nevertheless, Lyon assured Deru in writing that the "[r]evenue will flow to AA." On information and belief, this promise was false and has never materialized.

38. Incidentally, Lyon's attempts to conceal and justify contracts that were executed in the name of IGT that should have been for the benefit of AA also represent Lyon and IGT's broader scheme to defraud other industry participants, specifically including BAA. BAA is a data aggregation service owned by Morningstar that collects financial information from a wide variety of financial accounts (401k accounts, annuities, bank accounts, etc.) and compiles that data into a single data feed to be sold to software vendors such as TW, AA or IGT. On information and belief, IGT has an "unlimited data feed license" with BAA, which IGT signed several years ago when IGT was new and long before AA was formed. Notably, BAA no longer offers unlimited licenses and IGT has only been able to retain the same by virtue of having obtained it several years ago. For example, if BAA were approached about a new license today, the licensee would be required to pay for the quantity of data BAA sends to the licensee. The

more data BAA sends to the licensee, the more the licensee is charged. On information and belief, Lyon has and continues to defraud BAA by running data feeds intended for AA clients through IGT's unlimited data feed license with BAA. Specifically, Lyon is defrauding BAA out of revenues from AA / MAX client data feeds despite the fact that MAX is an asset of AA, not IGT, and AA does not have a license to utilize BAA data feeds. Moreover, on information and belief, Lyon has taken such actions both knowingly and willfully as evidenced by, among other things, Lyon's written explanation for why contracts with AA clients were instead signed by Lyon in the name of IGT. While discovery will likely reveal additional evidence, Lyon has defrauded BAA out of revenues associated with at least Massey Quick (an AA customer) and intended to do the same with at least Quovo and Yodlee (other data aggregation services similar to BAA).

39. Even more egregious, in AA's CRM (known as Prosperworks, to which Lyon and Deru jointly shared access prior to Lyon's unilateral and improper termination of Deru, discussed in greater detail below), Deru discovered an email communication from Lyon to his attorneys, Paul Jaskot and Lori Lasher of the law firm Reed Smith, LLP, dated October 30, 2017. Lyon's communications with Mr. Jaskot and Ms. Lasher setting forth and seeking to further Lyon and IGT's deliberate efforts to defraud Deru and TW started as early as September 29th, 2017 and continued for at least the next several weeks. Regardless, the October 30th email demonstrates Lyon's intent to unlawfully defraud both TW (and thus its shareholders) by syphoning off TW's and AA's valuable assets and intellectual property to IGT's sole benefit, while attempting to

extract unlawful concessions from Deru via coercion. In full, Lyon's October 30th email reads as follows:

> Paul & Lauri [*sic*],
>
> Thank you both for your work on getting me prepared to address this issue. Below is my understanding of the proper approach to addressing this with Damon.
>
> 1. Address the issue with Damon and let him know this is not working out. Let him know that I am not evoking [*sic*] the buy-sell clause in our agreement but would like to explore an amicable buyout of his 49%. I could suggest that we find two separate independent parties to value and we come to an agreement that way. Do you think that is the best route or just have him come back to me with a figure?
>
> 2. If Damon is not in agreement with this then I respond by explaining to him that if we can't come to an amicable resolution that I will take steps to remove him as both a manager and employee of the company. Pertaining to this action I would like to understand the actions that I can do to both protect IGT and restructure our product & revenue **so that it all flows to IGT**. If our discussion comes to this I would like to know what I can do to protect IGT and **restructure AdvisersAlpha to limit AdvisersAlpha revenue**.
>
> Other items that I would like to clear up before I address with Damon;
>
> 1. The IP contributed from Advisers Alpha/Trade Warrior are contained within the trading and rebalancing capabilities brought over from the TradeWarrior product as well as the revenue from their exsisting [*sic*] client base. **I would like to retain both**, are there suggestions outside of a amicilble [*sic*] buyout that **I can position IGT to retain both the IP and asset/reveune** [*sic*] **of their client base?**
>
> 2. Damon probably would make the claim that specific elements created for our combined product would be IP of AdvisorsAlpha. My position is that 99% of the work done on the product was done by IGT employees. I would make the point that the combined product is actually IP of IGT. The product sits on servers paid for by IGT, connected to a URL that IGT owns,[1] **all agreements are with IGT**,

---

[1] Notably, there was never any discussion or consent to host AA IP on IGT servers; Lyon took these steps unilaterally and without Deru's knowledge, approval or consent.

etc. We created a [*sic*] investment marketplace which is a core feature of the combined product which was entirely done by IGT employees. Thoughts here?

3. The primary source of revenue for our combined product is a revenue sharing agreement we have entered into with asset managers (i.e. BlackRock, Vanguard, etc). All of these agreements have been done between IGT and the asset manager. The secondary source of reveune [*sic*] is a fee to unlock capabilities to trade the universe of investment funds or securities, I would like to be able to make the claim that this is also IGT revenue as this was IP that was created by IGT employees. I would like to be comfortable that **this revenue stream would be considered to be IGT revenue and not Advisers Alpha**. Thoughts?

4. I was thinking that I could roll all the trading & rebalancing capabilities into a IGT product and charge for features not related to trading & rebalancing. This would be a business decision that charging for trading & rebalancing yields a lower return than an alternative reveune [*sic]* model. Thoughts here?

5. **If I removed Damon as a manager & employee what changes could I make to AdvisersAlpha to reduce or eliminate it?** Could I change the reveune [*sic*] model so there would be a reveune [*sic*] stream that would include some of their IP features to IGT? **Could I eliminate AdvisersAlpha altogether** as a business case for pushing their existing clients into a different business model owned by IGT would be a better business decision?

It would be great if we could find a time to discuss this further this week. Let me know what days/times work for both of you to find a time to continue our discussion.

Thanks,
David[2]

40. Deru's discovery of Lyon's October 30th email destroyed Deru's trust and confidence in Lyon, his business partner. Lyon's October 30th email demonstrates that Lyon, in breach of his fiduciary obligations and duty of loyalty, has been using AA to act in his own best interests or those of IGT, entirely devoid of "good faith and fair dealing" implicit in the JV. To this end, Deru approached Lyon in person in the IGT offices in Chicago on November 17, 2017,

[2] All emphases added.



4812-8707-9263

telling Lyon that Deru had discovered the October 30th email and that, because of Lyon's breach of trust, Deru and Lyon needed to find a path to dissolve their partnership.

41. Lyon's October 30th email demonstrates an organized scheme, including an ongoing pattern of conspiring and colluding with Lyon / IGT's attorneys and other IGT employees, including but not limited to Moutzouros, conducting the affairs of AA to defraud TW and TW's owners of their valuable property interests. Moreover, Lyon used electronic transmissions and/or the U.S. Mail in connection with interstate commerce in the commission of his fraudulent activities and material misrepresentations.

42. Notably, among other false assertions in Lyon's October 30th email, Lyon's assertion that "99% of the work done on the [MAX] product was done by IGT employees" is flatly false. In fact, MAX is predominantly based on work that TW developers completed independent of IGT or its employees.[3] Indeed, the TW development team accomplished **more than double** the "development points" (an internal measure of the degree of difficulty and time it takes a developer to complete a feature in order to facilitate company efforts to track the effort of each developer or team) of the Oranj/IGT team (2,586 compared to 1,076) between formation of the JV and Lyon's unilateral termination of Deru, despite having fewer developers on TW's development team.

[3]TW definitively provided the basic infrastructure upon which MAX is built, including *inter alia* "Security Master," MAX's authorization service, and all of MAX's rebalancing / trading workflows among legion additional functions.

43. As mentioned above, since formation of the JV, Lyon has indicated his intention to move all of the TradeWarrior software into MAX, contrary to Lyon's pre-JV formation commitments, representations and promises.

44. In breaching his fiduciary obligations after formation of the JV and directing and conducting the affairs of AA to defraud Deru and TW, Lyon and IGT conspired with at least Moutzouros in carrying out Lyon's organized fraudulent scheme.

45. Since the organization of AA, IGT and TW—the sole members of AA—have had multiple and ongoing disagreements and conflicts regarding planned and committed activities of AA including, but not limited to, at least the following:

a. the decision not to develop TradeWarrior Version 3 ("TW3");

b. a consistent lack of development resources allocated to TW in breach of Lyon's obligations under the Agreement;

c. the focus of AA's sales team and efforts, such as Lyon's instructions to no longer make outbound sales effort for TradeWarrior;

d. TW and Deru's general exclusion from virtually all major business decisions impacting, *inter alia*, AA's company direction and TW; and

e. relatedly, Lyon's unilateral acts conducting the affairs of AA.

46. Moreover, IGT and TW serially discussed the above-identified disagreements (among others) between October and December 2017 but were unable to resolve these disagreements.

47. For example, on December 14, 2017, during a meeting in Chicago for the self-avowed purpose of discussing and negotiating a settlement of their disagreements and a separation of their interests, Lyon unilaterally terminated Deru as an officer and the President of

AA. Lyon's decision to terminate Deru was made without any discussion between Lyon and Deru, the two managers of AA. Lyon also threatened to terminate the key TW leadership personnel if Deru did not capitulate to Lyon's demand that Deru accept an extremely low value for TW's interests in AA to resolve the above-referenced disagreements. Lyon ultimately carried through with this threat, terminating key TW leadership personnel only a week later during a visit he, Moutzouros, and Lombard made to the AA office in Utah. Likewise, Lyon threatened Deru with a lawsuit against Deru personally absent capitulation—a threat Lyon has continued to assert even down to the present time. On information and belief, all of Lyon's threats were intended to coerce Deru into accepting Lyon's unlawful demands in order to carry out Lyon and IGT's ongoing scheme to defraud TW and TW's shareholders out of their property, asserts, rights, and interests.

48. Following Lyon's unilateral and improper termination of Deru's employment in December 2017, IGT and TW have had additional disagreements—and continue to have disagreements—regarding at least the following material matters:

a. the unilateral actions taken by Lyon as manager in firing Deru;

b. Lyon's unilateral decision to retain Reed Smith as counsel for AA despite an obvious conflict of interest where Reed Smith simultaneously represents IGT and Lyon and Lyon has conspired with Reed Smith to defraud AA;

c. action to reinstate Deru as President, and reverse his improper termination;

d. action to remove Lyon as manager and CEO for abuse of authority and breach of fiduciary duty;

e. action to amend Section 14.1 of the Agreement to eliminate Lyon as a designated manager of AA;

f. a determination that AA should sue Lyon for breach of his fiduciary duties, exceeding authority, theft of corporate opportunities, harm to the company, civil conspiracy, etc. (if AA does not do so, then TW would be justified in bringing a derivative suit);

g. action to rescind and unwind AA because of Lyon and IGT's fraudulent conduct, returning to each of the parties the assets they brought to the JV;

h. decision to appoint a receiver and dissolve AA;

i. action to adopt new proposals to amend the Agreement; and

j. decision to reclassify IGT contributions as loans, not as capital, which Mr. Lyon unilaterally, intentionally, and wrongly classified contrary to the Agreement.

49. Section 15.4 of the Agreement was drafted for the express purpose of giving IGT and TW an opportunity for a fair buy-out in the event of a material member disagreement, such as the above-identified disagreements which currently exist. Specifically, Section 15.4 states that, if the members of AA entitled to vote on a material matter are unable to agree as to resolution of that material matter, and the disagreement continues for fifteen (15) days, then either member can exercise certain buy-sell rights, thereby facilitating a fair and equitable buy-out of the other member.

50. Indeed, recognizing the existence of an unequal ownership of AA between only two members (IGT and TW), thus rendering a typical "deadlock" standard ineffective for purposes of the buy-out clause, IGT and TW agreed that their buy-sell rights would be triggered in the event of a "disagreement" between the members as to any material matter, rather than a typical deadlock.

51. The members of AA are TW and IGT. The managers are Lyon and Deru. As described above in reference to section 15.4 of the Agreement, any "disagreement" giving rise to

the buy-sell clause is to be judged at the *member* level. To this end, Deru has previously and repeatedly notified Lyon of TW's disagreements concerning the material matters itemized in Paragraphs 45 & 48, *supra*, including during their December 14, 2017 meeting in Chicago and again on January 26, 2018 during an attempted mediation, to which Lyon has consistently responded that those "matters are not subject to Member voting" with the alleged lone exceptions of removing Lyon as a manager of AA and amending Section 14.1 of the Agreement accordingly. Regardless of Lyon's improper circumscribed reading of Section 15.4, each of the material disagreements outlined above remain unresolved down to the present time.

52. The above-referenced material matters upon which IGT and TW disagree have repeatedly come up in the course of actions taken by Lyon over the last several months. Lyon, nevertheless, contends that the Agreement does not specifically grant authority for votes on any such matters with the possible exceptions of removing Lyon as a manager of AA and amending Section 14.1 of the Agreement. But while all potential material disagreements espoused under Section 15.4 of the Agreement are not specifically enumerated, neither are particular disagreements precluded under the Agreement. Regardless, the facts of this case, and the actions of Lyon, dictate, in equity, that material and vote-able disagreements exist between TW and IGT at the member level, especially since the two managers are clearly deadlocked on these points.

53. Moreover, contrary to Lyon's contentions, Section 15.4 of the Agreement does not even require a formal "vote," but just a "disagreement." To this end, there can be no dispute that IGT and TW disagree on each of the above points and such disagreements have persisted for more than fifteen (15) days. If that is not the case, then Lyon would let TW take each of those

actions and the circumstances would be completely reversed, e.g., Lyon would permit Deru to, among other things, unilaterally terminate Lyon's employment as CEO of AA, etc.

54. TW has previously, in compliance with Section 15.4 of the Agreement, submitted a valuation to Lyon and IGT of $16 million for AA, with the proposal to either purchase IGT's interest for $8,160,000 (less Lyon's remaining capital contribution obligations)[4] or for TW to be bought out for $7,840,000. Nevertheless, despite repeatedly tendering the foregoing, Lyon has consistently refused to acknowledge a material disagreement in order to artificially avoid his contractual obligations under Section 15.4 of the Agreement.

55. Notably, Lyon's failure to acknowledge Deru's buy-sell proposal under Section 15.4 of the Agreement is itself a default election to sell IGT's interests to TW for $5,910,000 ($8,160,000 less Lyon's remaining $2.25 million capital contribution obligation) under sub-section 15.4(b) of the Agreement.

56. Lyon and Deru are the co-managers of AA. To this end, the Agreement directs their manner of acting in Section 14.2, which requires that all decisions or actions of the managers shall require a majority vote of the managers in office.

57. Since there are only two managers, Section 14.2 of the Agreement effectively requires that the managers must make all decisions and take all actions *unanimously*. Lyon has, nevertheless, chosen to not do so, and in fact has not even consulted Deru in many actions that

[4] On information and belief, Lyon was still obligated to contribute approximately $2.25 million to AA as of Deru's termination date in December 2017.

Lyon has unilaterally taken in conducting the affairs of AA. For example, without consent from, or even notice to Deru, Lyon has:

a. terminated Deru;

b. terminated other key employees of AA who were previously TW employees, and some of whom are owners of TW;

c. engaged his personal legal counsel, Reed Smith, to represent AA even though Reed Smith has a conflict of interest inasmuch as they cannot simultaneously represent the interests of all of the members of AA fairly;

d. intentionally misclassified his personal contributions to AA as loans instead of capital, as required by the Agreement;

e. attempting to illegally convert the assets and intellectual property that TW contributed to AA into property and income for his own company, IGT;

f. stealing corporate opportunities belonging to AA by entering into agreements in the name of IGT when the proper party was AA;

g. unilaterally deciding to pay for 40% of the IGT development costs from the AA budget;

h. unilaterally removing Deru's access to various AA files and documents in order to conceal agreements that were executed in the name of IGT when such agreement should have been executed in the name of AA; and

i. deciding to merge the TradeWarrior product and customers into MAX over Deru's objection.

58. In all these actions, Lyon has acted beyond his authority as a manager of AA, *ultra vires*, and with fraudulent intent.

59. Section 14.3 of the Agreement details the authority of AA's managers, including, *inter alia*, the authority to manage the operations and affairs of AA and to make all decisions regarding the business of AA subject to the obligation to act in good faith in exercising such rights and fulfilling managerial obligations under the Agreement.

60. Lyon's unilateral actions itemized above have not been undertaken in good faith in the fulfillment of his duties to AA; rather Lyon has consistently utilized his position as a manager of AA to act in his own self-interest, or the interests of IGT, in an effort to acquire all of the assets of TW and TW's owners.

61. Similarly, Section 22.11 of the Agreement requires the members to cooperate in a spirit of good faith, working with one another to effectuate the rights, obligations, and benefits of the Agreement, including enabling the other member to enjoy the rights granted to it in or as contemplated by the Agreement.

62. Lyon's unilateral conduct is and has been in violation and contravention of Section 22.11. Lyon has not acted in a spirit of good faith, but rather has unilaterally conducted the affairs of AA in a draconian fashion antithetical to mutual cooperation.

63. While the managers initially agreed to appoint Lyon as CEO and Deru as President of AA, there have been no specific agreed upon enumerations of their powers, authorities and duties, other than Lyon's commitment that Deru would continue to run TW and that Lyon and Deru would act as 50 / 50 business partners in the JV.

64. Deru's employment contract further confirms that, as President of AA, Deru was authorized to exercise all responsibilities, duties, and discretion customarily assigned to the position of President, including interacting with customer and prospects and developing AA's goodwill throughout the industry.

65. At all times, Deru's actions were consistent with his employment agreement.

66. Following the termination of Deru and other key TW employees who became employees of AA by virtue of the Joint Venture, Lyon caused a harmful notification to be sent to TW's clients on January 3rd, 2018, announcing the terminations of Deru, Patrick Keel, and Janson Evans, which has caused serious reputational damage to each person, damages to the goodwill of TW, and otherwise interfered with Deru's and TW's existing or potential business relationships.

67. In view of all of the foregoing, and the manifest disagreements between TW and IGT with respect to the operation and advancement of AA's interests, TW and Deru, on the one hand, and IGT and Lyon, on the other hand, engaged in serial discussions in an effort to resolve their disputes in December 2017 and January 2018.

68. Those discussions culminated in a voluntary 2-day mediation held on January 25-26, 2018 in Chicago, Illinois.

69. During the course of the above-referenced mediation, TW / Deru and IGT / Lyon seemingly resolved their dispute and reached agreement on a number of issues. Specifically, the mediation resulted in the preparation and execution of a Binding Settlement Term Sheet agreement (the "Term Sheet") on January 26, 2018.[5] While the parties intended to "enter into a final full length Settlement Agreement in accordance with the terms of th[e Term Sheet]" by February 28, 2018, the parties nevertheless agreed that "if the parties are unable to finalize the anticipated full length Settlement Agreement that this [T]erm [S]heet agreement will be binding

[5] A copy of the Binding Settlement Term Sheet agreement is attached hereto as **Exhibit "A"**.

and enforceable."[6] Simply stated, the Term Sheet "represents the parties' amicable resolution of the dispute between them…."[7]

70. Notwithstanding the nominal resolution of the parties' dispute, the Term Sheet required a number of additional subsequent steps, including *inter alia* the exchange of certain specified information by specific dates, the assignment of certain assets, and mutual agreement on a number of open issues. For example, among other post-January 26, 2018 commitments under the Term Sheet, the Term Sheet required as least the following:

a. IGT / AA was to "assign to Deru all [AA] clients using [TradeWarrior Version 1 ("TW1") & TradeWarrior Version 2 ("TW2") code] in accordance with a client list as of January 26, 2018";[8]

b. IGT agreed "to cooperate and work in good faith to transfer all client records, including but not limited to billing records, as soon as practicable after the Effective Date";[9]

c. Deru agreed to "provide IGT and [AA]" with certain "code by no later than Friday, February 2, 2018" with the parties to agree "on a universe of duplicate code" to be commonly owned "[b]y no later than Wednesday, February 21, 2018";[10]

d. IGT / AA was to "assign to Deru a complete duplicate [co-owned] copy of all [of the code]";[11]

e. The parties were to mutually agree, "[b]y no later than Wednesday, February 21, 2018, … as to identification of [AA or IGT's] existing customers and active prospects" to be retained by IGT;[12]

[6] *Id.* at 1 & ¶ 19.
[7] *Id.* at 1.
[8] *Id.* at ¶ 1.
[9] *Id.*
[10] *Id.* at ¶ 2.
[11] *Id.* at ¶ 3.
[12] *Id.* at ¶ 5.

f. IGT was to entirely cease using the name "TradeWarrior";[13]

g. The parties were to "work in good faith" and cooperate to mutually agree "on or before February 21, 2018" as to the redirection of various existing web domains;[14]

h. AA / IGT were to pay Deru $450,000 ($300k lump sum, and $150k spread out over nine monthly installment payments) following the effective date;[15]

i. The parties were to "agree to specific language to be jointly drafted … concerning statements about resolution of the parties' dispute when explaining to clients, media, employees, etc.";[16]

j. AA was to be dissolved;[17]

k. Deru was to create a new entity to service the TW1 and TW2 clients;[18]

l. IGT / AA agreed to "confer in good faith" with respect to the release of non-compete agreements related to former TW employees that Lyon had unilaterally terminated with respect to employment with Deru's new entity;[19] and

m. The parties were to "use reasonable best efforts to execute a final settlement agreement consistent with the terms set forth herein by February 28, 2018."[20]

71. At all relevant times, Deru has complied with and/or worked in good faith to comply with each and every one of his obligations under the Term Sheet.

72. Nevertheless, Lyon, IGT and AA are in material breach of the Term Sheet, having failed to comply with numerous obligations thereunder, manufacturing pretexts to avoid or delay their contractual obligations, or unilaterally demanding additional and un-bargained for

---

13 *Id.* at ¶ 6.
14 *Id.* at ¶¶ 7-8.
15 *Id.* at ¶ 9.
16 *Id.* at ¶ 10.
17 *Id.* at ¶ 11.
18 *Id.* at ¶¶ 12-16.
19 *Id.* at ¶ 18.
20 *Id.* at ¶ 19.

consideration. For example, Lyon / IGT / AA have yet to (a) assign any of the TW1 or TW2 client's to Deru's new entity, (b) transfer the complete TW1 and TW2 client records to Deru's new entity, (c) agree to a universe of duplicate code to be co-owned, (d) assign the duplicate code to Deru's new entity, (e) provide complete copies of TW1, TW2 and TW3 code to Deru's new entity, (f) finalize a mutual agreement as to the clients / prospects that IGT will retain, (g) cease using the name TradeWarrior, (h) work with Deru in good faith to agree as to the redirection of various web domains, (i) pay TW, (j) agree to specific, jointly drafted language to be used with the clients, media, etc., (k) dissolve AA, (l) work in good faith to release former TW employee non-compete agreements for purposes of employment with Deru's new entity, and (m) use reasonable efforts to execute a final settlement agreement to supplant the Term Sheet. Indeed, not only are Lyon / IGT / AA in material breach of the Term Sheet, they have demanded, *inter alia*, the production of various computers and devices not contemplated by the Term Sheet, some $150,000 in un-bargained for additional consideration for the release of former TW employee non-compete agreements, and a one-way 9-month period for continued use of the TradeWarrior name while refusing to allow Deru's new entity to make any references to the TradeWarrior name whatsoever. Likewise, Lyon / IGT / AA have continued to serially delay final resolution of the parties' dispute such that the consideration bargained for and contemplated in the Term Sheet has and continues to diminish in value to Deru and TW's detriment. Meanwhile, and contrary to the express provisions of the Term Sheet, Lyon / IGT / AA refuse to allow Deru to launch and begin operation of a new entity, partially forestalling the same through serial and unjustified delays.

73. In addition, irrespective of the Term Sheet, the intent of which is to dissolve AA and rescind the Agreement, IGT / Lyon continue to assert various rights under the Agreement (including rights that are ancillary to the Agreement, such as the former AA employee non-compete agreements) while suggesting that other obligations under the Agreement have been rescinded or repudiated by the Term Sheet. Meanwhile, IGT and AA have continued, long past the date on which the Term Sheet was executed and in violation of both the spirit and letter of that agreement, to collect TW revenues that were supposed to belong to Deru's new company and estimated to be worth approximately $180,000.

74. Regardless, notwithstanding the requirements of the Term Sheet, and the deadlines agreed to therein, the parties were unable to finalize a full length settlement by February 28, 2018. Indeed, Lyon and IGT took primary responsibility for preparing the first draft of a proposed full length settlement agreement in early February 2018 but failed and refused to use reasonable best efforts to even provide a draft proposal prior to February 28, 2018. And Lyon and IGT's failure and refusal to prepare an initial draft subsisted, without excuse, good cause, or explanation, for more than two months following the conclusion of mediation. In fact, while repeatedly promising to provide an initial draft of a proposed final agreement for many weeks and leading Plaintiffs to believe that they were diligently preparing the same during the interim, as late as March 24, 2018 Lyon and IGT ultimately refused to even begin to "*start* wordsmithing" a proposed full length settlement agreement absent Deru's unconditional agreement to each and every one of Lyon / IGT's following demands for additional consideration and/or rights not contemplated by the Term Sheet:

- unequivocal approval Lyon/IGT/AA's list of customers and prospects despite the fact that many of those customers and prospects were TW's prior to the JV;
- unequivocal withdrawal of Plaintiffs' demand that certain former TW employees be released from their restrictive covenants for purposes of working for Deru's new company notwithstanding Lyon/IGT/AA's obligation under the Term Sheet to confer in good faith concerning the same;
- unequivocal withdrawal of Plaintiffs' demand that Lyon/IGT/AA cease using the TradeWarrior name despite that express prohibition in the Term Sheet; and
- unequivocal withdrawal of Plaintiffs' objection to Lyon/IGT/AA's demand that they be allowed to contact and solicit all of Deru's new company's clients post-settlement.

Irrespective of Plaintiffs' rights under the Term Sheet, and in a show of good faith intended to encourage Lyon and IGT to begin drafting a proposed full length settlement agreement and finalize the parties' separation, Plaintiffs acknowledged, in principal, to Lyon and IGT's new, extra-Term Sheet demands. Likewise, Plaintiffs offered to provide all remaining deliverables required of Plaintiffs under the Term Sheet immediately. Nevertheless, and despite repeatedly demanding Plaintiffs' deliverables prematurely, IGT and Lyon continued to delay preparation of a proposed full length settlement agreement without excuse, justification, or good cause, even refusing to accept Plaintiffs' deliverables to forestall forward progress.

75. On April 2, 2018, long after the deadlines contemplated under the Term Sheet and long after having repeatedly promised to do so, Lyon and IGT finally provided a seventeen (17) page proposed full length settlement agreement purportedly "consistent with the terms set forth"

in the four (4) page Term Sheet.[21] Even then however, after months of unsuccessful efforts to finalize the parties' separation, Lyon and IGT's proposed full length settlement agreement grossly contradicts the parties' Term Sheet agreement in several respects. The following examples are illustrative:

- despite agreeing in the Term Sheet to unconditionally transfer and assign all TW1 and TW2 clients to Deru's new company, Lyon and IGT's proposed full length settlement agreement includes various carve outs to retain such clients and/or actively solicit the same. In fact, the very day that Lyon and IGT's proposed full length settlement agreement was transmitted, Lyon and IGT were already undertaking efforts to solicit all TW1 and TW2 clients contrary to the covenant of good faith and fair dealing inherent to Lyon and IGT's agreement to assign such clients to Deru's new company;

- despite the absence of any corresponding rights in the Term Sheet, Lyon and IGT's proposed full length settlement agreement demands certain audit logs and the right to augment or alter clients to be retained by IGT after the parties' separation;

- Likewise, Lyon and IGT's proposed full length settlement agreement imposes obligations on Deru foreign to the Term Sheet and often outside of Deru's ability to control, making any perceived error or inaccuracy an immediate and automatic material breach requiring, among other things, Deru's forfeiture of all monetary consideration under the Term Sheet;

- Lyon and IGT's proposed full length settlement agreement likewise demands, without any corresponding provision of the Term Sheet and contrary to reality, that Plaintiffs unequivocally admit to the destruction of certain property in breach of unidentified contractual obligations while simultaneously representing and warrantying the actions of independent third persons, with any perceived error or inaccuracy resulting in an immediate and automatic material breach requiring, among other things, Deru's forfeiture of all monetary consideration under the Term Sheet;

- directly contrary to the express requirements of the Term Sheet as to the co-ownership of certain intellectual property, Lyon and IGT's proposed

[21] *Id.* at 1 & ¶ 19.

full length settlement agreement instead seeks to retain independent ownership while only granting Deru's new company a license while limiting Deru's new company's ability to license, sublicense, assign or transfer any such rights;

- directly contrary to the express requirements of the Term Sheet as to the co-ownership of certain intellectual property, Lyon and IGT's proposed full length settlement agreement breaks Lyon and IGT's obligations to pay Plaintiffs "$300,000 … within five business days" into eight installments commencing thirty business days after execution. Likewise, instead of paying Plaintiffs $150,000 in equal installments over the period of nine (9) months as explicitly agreed to in the Term Sheet, Lyon and IGT's proposed full length settlement agreement extends the entire payment out for a year; and

- despite the absence of any corresponding rights in the Term Sheet, Lyon and IGT's proposed full length settlement agreement demands the right to audit Deru's new business for a year, with virtually unfettered access to all of that company's competitive information.

While neither comprehensive nor exhaustive, the foregoing examples demonstrate the vast gulf between the parties' Term Sheet and Lyon and IGT's proposed full length settlement agreement.

76. On information and belief, Lyon and IGT have (a) deliberately delayed finalizing the parties' separation, (b) deliberately delayed preparation of a proposed final settlement agreement, (c) deliberately refused to cooperate in good faith, including on various provisions of the Term Sheet which require cooperation, and (d) deliberately proposed an unpalatable proposed final settlement agreement in contravention of the Term Sheet in order to deprive Plaintiffs of the consideration bargained for under the Term Sheet, including delaying the creation and development of Deru's new company while IGT and Lyon undermine Plaintiffs' business relationships with the TW1 and TW2 clients and depriving Plaintiffs' of significant and valuable revenues to which they are entitled under the Term Sheet.

77. In view of the foregoing, the parties have been entirely "unable to finalize the anticipated full length Settlement Agreement," let alone by February 28, 2018. As such, the Term Sheet constitutes the "binding and enforceable" agreement governing the parties' relationship.[22] Given IGT and Lyon's delays, Plaintiffs have sought to finalize the parties' separation pursuant to the Term Sheet in lieu of a full length settlement agreement but IGT/Lyon/AA ignored those efforts.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Breach of the Term Sheet – Damages (Against Lyon, IGT & AA)

78. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

79. On January 26, 2018, the parties executed the Term Sheet, which is a valid, binding, and enforceable contract.

80. The Term Sheet imposes various obligations on Lyon / IGT / AA, with which they voluntarily agreed to be bound.

81. The rights, obligations and requirements set forth in the Term Sheet are and were supported by adequate consideration.

82. At all relevant times, Plaintiffs have complied with, and/or worked in good faith to comply with, each and every one of their obligations under the Term Sheet.

[22] *Id.* at 1 & ¶ 19.

83. Nevertheless, and notwithstanding their contractual obligations to the contrary, Lyon, IGT and AA are in material breach of the Term Sheet, having failed to comply with numerous obligations thereunder, manufacturing pretexts to avoid or delay their contractual obligations on an ongoing and indefinite basis, unilaterally demanding additional un-bargained for consideration, and so forth.

84. Deru and the new entity he created pursuant to the Term Sheet (*i.e.*, TW's successor in interest) have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon, IGT and AA's conduct. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's conduct.

85. Beyond irreparable harm to Deru and TW, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Breach of the Term Sheet – Specific Performance (Against Lyon, IGT & AA)**

86. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

87. On January 26, 2018, the parties executed the Term Sheet, which is a valid, binding, and enforceable contract.

88. The Term Sheet imposes various obligations on Lyon / IGT / AA, with which they voluntarily agreed to be bound.

89. The rights, obligations and requirements set forth in the Term Sheet are and were supported by adequate consideration.

90. At all relevant times, Plaintiffs have complied with, and/or worked in good faith to comply with, each and every one of their obligations under the Term Sheet.

91. Nevertheless, and notwithstanding their contractual obligations to the contrary, Lyon, IGT and AA are in material breach of the Term Sheet, having failed to comply with numerous obligations thereunder, manufacturing pretexts to avoid or delay their contractual obligations on an ongoing and indefinite basis, unilaterally demanding additional un-bargained for consideration, and so forth.

92. Deru and the new entity he created pursuant to the Term Sheet (*i.e.,* TW's successor in interest) are entitled to specific performance of the Term Sheet, including, but not limited to, the assignment of all TW1 and TW2 clients, the migration of all TW1 and TW2 client records and client databases, the provision and assignment to Deru of all TradeWarrior code, Lyon / IGT / AA's cessation from use of the TradeWarrior name, mutual agreement as to the redirection of various web domains, full payment under the Term Sheet, mutual agreement as to media or other public statements, dissolution of AA, the release of former TW employee non-compete agreements, and so forth.

93. Plaintiffs stand ready, able and willing to perform under the Term Sheet and are, therefore, entitled to specific performance.

94. Plaintiffs have suffered and will continue to suffer irreparable injury as a direct and proximate result of Lyon, IGT and AA's conduct. Absent injunctive relief, Plaintiffs will

continue to be irreparably damaged by Lyon, IGT and AA's conduct. More specifically, Plaintiffs have no adequate remedy at law and are entitled to injunctive relief, including an award of specific performance under the Term Sheet.

**THIRD CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Lyon, IGT & AA)**

95. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

96. On January 26, 2018, the parties executed the Term Sheet, which is a valid, binding, and enforceable contract.

97. The Term Sheet contains both express and implied covenants of good faith and fair dealing.

98. At all relevant times, Plaintiffs have complied with, and/or worked in good faith to comply with, each and every one of their obligations under the Term Sheet.

99. Nevertheless, and notwithstanding their contractual obligations to the contrary, Lyon, IGT and AA have materially breached the express and implied covenants of good faith and fair dealing expressly set forth and/or implied under the Term Sheet, having failed to comply with numerous obligations thereunder, manufacturing pretexts to avoid or delay their contractual obligations on an ongoing and indefinite basis, unilaterally demanding additional un-bargained for consideration, and so forth.

100. Deru and the new entity he created pursuant to the Term Sheet (*i.e.*, TW's successor in interest) have suffered and will continue to suffer irreparable injury, in addition to

monetary damages, as a direct and proximate result of Lyon, IGT and AA's conduct. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's conduct.

101. Beyond irreparable harm to Deru and TW, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment (Against Lyon, IGT & AA)**

102. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

103. In connection with the Agreement, and consistent with the Term Sheet, AA acquired all of TW's assets, including, but not limited to, the TradeWarrior software, inclusive of TW1, TW2 & TW3. Likewise, under the Term Sheet, Lyon / AA / IGT are entitled to maintain ownership of the TradeWarrior software despite the intended dissolution of AA, the entity through which such rights flowed solely to AA to begin. In addition, under the Term Sheet, Lyon / AA / IGT have received and are entitled to maintain ownership of additional code developed in connection with the provision of TradeWarrior software services. Not only this, but in connection with the JV and Agreement, and consistent with the Term Sheet, Lyon / AA / IGT are entitled to maintain ownership of the jointly developed MAX software product, the vast majority of which was developed by TW.

104. Lyon / AA / IGT have voluntarily accepted and received, *inter alia*, the foregoing benefits and are aware of the same.

105. To the extent Lyon / AA / IGT are not required to comply with their contractual obligations for any reason, it would be unjust and inequitable to allow Lyon / AA / IGT to retain the foregoing benefits without compensating Plaintiffs therefore in an amount equal to the fair market value of all such benefits.

106. Plaintiffs have incurred and will continue to incur monetary damages as a direct and proximate result of the benefits bestowed upon Lyon, IGT and AA absent just compensation. Likewise, Plaintiffs have suffered and will continue to suffer irreparable injury, as a direct and proximate result of Lyon, IGT and AA's conduct. Absent equitable relief, Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's conduct.

**FIFTH CLAIM FOR RELIEF**
**Tortious Interference (Against Lyon, IGT & AA)**

107. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

108. Lyon / AA / IGT have intentionally interfered with Plaintiffs' existing and potential economic relationships, including, but not limited to, existing and potential relationships between TW / Deru, on the one hand, and TW's as well as AA's clients and employees prior to the JV, during the JV, and since the JV on the other hand by, among other things, fraudulently inducing the JV, breaching fiduciary duties to the JV, unilaterally terminating Deru and other key TW employees, unnecessarily notifying various clients of those terminations, surreptitiously entering contracts that should have been for the benefit of AA solely on behalf of IGT, and so forth.

109. Lyon / AA / IGT knew about the foregoing existing and potential relationships from before the JV was formed and continue to have knowledge and awareness of the same.

110. Lyon / AA / IGT intentionally undertook the above-described actions, without justification, for the purpose of interfering with Plaintiffs existing and potential economic relationships.

111. Lyon / AA / IGT's conduct has resulted in the loss, disruption or diminution of certain existing and potential economic relationships that existed prior to the JV. Such conduct continues to threaten Plaintiffs' remaining existing and potential economic relationships.

112. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon, IGT and AA's conduct. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's conduct.

113. Beyond irreparable harm to Deru and TW, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**Fraud in the Inducement / Fraudulent Misrepresentation**
**(Against Lyon, IGT & Moutzouros)**

114. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

115. Lyon and/or Moutzouros, on behalf of themselves and IGT, made numerous false statements and/or false representations of material fact for the purpose of inducing TW to enter into the Agreement, including, but not limited to, the status of IGT's Oranj software

development and features, the existence of 1,700 plus clients when only 17 existed, the gross exaggeration of IGT's revenues, the existence of significant cross-marketing opportunities that would be available to TW upon entering into the JV, Deru's continued control of TW post-JV, the 50 / 50 partnership that was to exist between Lyon and Deru in the management of the JV, TradeWarrior's continued viability as an independent software product post-JV, and so forth.

116. These material misrepresentations of fact were knowingly false, or believed to be false, at the time Lyon / Moutzouros / IGT made them.

117. Not only were Lyon / Moutzouros / IGT's misrepresentations made for the purpose of inducing TW to enter the Agreement, but TW and Deru in fact acted, to their detriment, in reliance upon the truth of Lyon / Moutzouros / IGT's representations in entering the JV in lieu of pursuing other business opportunities.

118. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon / Moutzouros / IGT's conduct. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon / Moutzouros / IGT's conduct.

119. Beyond irreparable harm to Deru and TW, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial.

**SEVENTH CLAIM FOR RELIEF**
**Negligent Misrepresentation (Against Lyon, IGT & Moutzouros)**

120. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

121. Lyon and/or Moutzouros, on behalf of themselves and IGT, made numerous false statements and/or false representations of material fact for the purpose of inducing TW to enter into the Agreement, including, but not limited to, the status of IGT's Oranj software development and features, the existence of 1,700 plus clients when only 17 existed, the gross exaggeration of IGT's revenues, the existence of significant cross-marketing opportunities that would be available to TW upon entering into the JV, Deru's continued control of TW post-JV, the 50 / 50 partnership that was to exist between Lyon and Deru in the management of the JV, TradeWarrior's continued viability as an independent software product post-JV, and so forth.

122. These material misrepresentations of fact were carelessly or negligently made by Lyon / Moutzouros / IGT, without regard to ascertaining the truth.

123. Not only were Lyon / Moutzouros / IGT's misrepresentations made for the purpose of inducing TW to enter the Agreement, but TW and Deru in fact acted, to their detriment, in reliance upon the truth of Lyon / Moutzouros / IGT's representations in entering the JV in lieu of pursuing other business opportunities.

124. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon / Moutzouros / IGT's conduct. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon / Moutzouros / IGT's conduct.

125. Beyond irreparable harm to Deru and TW, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial.

**EIGHTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty / Duty of Loyalty / Duty of Care (Against Lyon & IGT)**

126. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

127. As the CEO and co-manager of AA, Lyon owed AA, TW, and Deru fiduciary duties of care, trust and loyalty.

128. In addition, as a general employee of AA, Lyon owed AA, TW, and Deru fiduciary duties of care, trust and loyalty.

129. Likewise, as a member of AA, IGT owed AA, TW, and Deru fiduciary duties of care, trust and loyalty.

130. Lyon and IGT's fiduciary duties, duties of care, and duties of loyalty require them, at all times, to, among other things, act in AA's best interests, act in accordance with the terms of the Agreement and agreements ancillary thereto, and so forth.

131. Lyon and IGT breached their fiduciary duties of care, trust and loyalty to AA, TW, and Deru by, *inter alia*, (a) executing and then concealing from TW and Deru fraudulent contracts that were supposed to be for the benefit of AA, but were made solely in the name of IGT, (b) designing and scheming to use AA as a vehicle to wrest all of the assets and intellectual property from TW solely for the benefit of Lyon and IGT, (c) excluding Plaintiffs from files, documents, information and other business relationship opportunities of AA, (d) unilaterally taking actions on behalf of or otherwise conducting the affairs of AA, including terminating Deru and other TW employees, sending out notice of such termination to clients, working to

collapse TradeWarrior into a sub-product of MAX that would belong solely to IGT, interfering with Deru's operation of TW, and so forth.

132. Plaintiffs have incurred and will continue to incur injury and monetary damages as a direct and proximate result of Lyon and IGT's conduct, the full extent of which cannot yet be reasonably be ascertained and is subject to proof at trial.

133. Unless restrained by the Court, Lyon and IGT will continue their unlawful conduct to Plaintiffs' irreparable harm.

134. Plaintiffs have no adequate remedy at law and are entitled to immediate injunctive relief, enjoining Lyon and IGT from further unlawful acts.

135. Lyon and IGT's actions are intentional, willful, wanton and/or reckless and calculated to harm Plaintiffs' business affairs.

**NINTH CLAIM FOR RELIEF**
**Judicial Declaration of Rescission of the Agreement (Against Lyon & IGT)**

136. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

137. By virtue of Lyon / Moutzouros / IGT's fraudulent or negligent misrepresentations which induced TW to enter into the JV, the Agreement is either void *ab initio* or subject to judicial rescission. Alternatively, the Term Sheet supersedes the Agreement, thereby revoking, rescinding, or cancelling the Agreement and all agreements ancillary thereto in their entirety. Either way, the Agreement is null and void and the terms and provisions thereof are invalid and unenforceable.

138. Lyon / IGT / AA dispute that Lyon, Moutzouros and IGT made fraudulent or negligent misrepresentations and that such misrepresentations induced TW to entered into the Agreement. Likewise, irrespective of the Term Sheet, the intent of which is to dissolve AA and rescind the Agreement, IGT / Lyon / AA continue to assert various rights under the Agreement (including rights that are ancillary to the Agreement, such as the former AA employee non-compete agreements).

139. Accordingly, an actual and justiciable controversy exists between Plaintiffs and IGT / Lyon / AA as to rescission of the Agreement and whether or not any terms or provisions of the Agreement are valid or enforceable.

140. Plaintiffs request that the Court enter judgment that the Agreement (and all agreements ancillary thereto) is rescinded or otherwise void and of no effect.

141. In the alternative that the Court does not enter such a judgment, Plaintiffs request that the Court enter judgment (a) that at least one material disagreement exists under the Agreement, (b) that the at least one material disagreement has subsisted for in excess of fifteen (15) days without resolution, (c) that the Plaintiffs have tendered a valuation and notice to Lyon / IGT / AA pursuant to Section 15.4 of the Agreement, (d) that by failing to respond or make an election, Lyon / IGT have made an election to sell their interests in AA to Plaintiffs according to the terms of Plaintiffs' valuation / notice by default, and (e) requiring IGT / Lyon to comply with the provisions of Section 15.4, including the sale of Lyon / IGT interests in AA to Plaintiffs for the value set forth in paragraph 55 above.

**TENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962 (RICO)**
**(Against Lyon, IGT & Moutzouros)**

142. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

143. AA is a corporation, association or legal entity thereby comprising an enterprise within the meaning of 18 U.S.C. 1961(4).

144. Lyon, Moutzouros and IGT are each individuals or entities capable of holding a legal or beneficial interest in property thereby each comprising a person within the meaning of 18 U.S.C. 1961(3).

145. The joint actions of Lyon, Moutzouros and IGT alleged herein were carried out through AA, a separate and distinct legal entity constituting a RICO enterprise. And even if AA does not qualify as a RICO enterprise, Lyon, Moutzouros and IGT comprise a group of individuals forming an association-in-fact enterprise inasmuch as Lyon, Moutzouros and IGT have acted and associated together for a common purpose of engaging in a course of conduct to defraud Plaintiffs out of their legal and lawful property by fraudulently inducing the formation of AA. Moreover, a relationship exists between Lyon, Moutzouros and IGT inasmuch as, *inter alia*, Lyon and Moutzouros both work for IGT and are officers thereof. Moreover, Lyon is the CEO of AA, Moutzouros is either associated with AA via his employment with IGT or as an officer of AA, and IGT is a member of AA. Likewise, Lyon and Moutzouros have both acted in concert, combining their knowledge, skills, resources and labor to accomplish the purposes of IGT as well as their own. And the relationship between Lyon, Moutzouros and IGT has existed and will

continue to exist for a sufficient length of time to permit Lyon, Moutzouros and IGT to accomplish the purpose of defrauding Plaintiffs as well as other industry participants, including BAA. Without this relationship, neither Lyon, Moutzouros nor IGT could have, on their own, accomplished AA's or the association-in-fact enterprise's purposes.

146. By virtue of making or contributing, either directly or indirectly, to unilateral decisions to (a) terminate Deru, (b) terminate other key employees of TW, (c) engage Lyon's personal legal counsel on behalf of AA notwithstanding a conflict of interest, (d) misclassifying capital contributions as loans, (e) attempting to convert the assets of TW contributed to AA, (f) utilizing AA as a vehicle or front to clandestinely wrest corporate opportunities of AA for IGT's benefit, (g) allocating AA's resources and budget to the betterment and development of IGT at the expense of TW, (h) removing Deru's access to CRM databases of AA, (i) utilizing AA as a vehicle or front to clandestinely execute contracts on behalf of IGT, (j) merging the TradeWarrior software product and customers into MAX, (k) misrepresenting the development and features of Oranj in order to induce the formation of AA and, thereby, acquire TW's assets, trade secrets, knowhow, and other intellectual property, (l) making other false representations to induce formation of the JV in order to obtain TW's assets, and so forth, Lyon, Moutzouros and IGT conducted or participated, directly or indirectly, in the conduct of AA's and/or the association-in-fact enterprise's affairs.

147. In doing so, Lyon, Moutzouros and IGT violated at least 18 U.S.C. § 1962(c) by conducting the affairs of AA and/or the association-in-fact enterprise through a pattern of racketeering activity, including, but not limited to, perpetrating a fraud on Deru, TW, the other

owners of TW and other industry participants, such as BAA, through means of U.S. mail, wire and/or electronic transmissions affecting interstate commerce. For example, among other misrepresentations, Lyon, on behalf of himself and IGT, represented to Deru, TW and other industry participants *circa* January 2017, via electronic and/or mail transmissions in several instances, that IGT had 1,700 or more clients, annual revenues in excess of $2.5 million, and $198 billion in AUM. These representations were false. Similar representations published industry wide in at least March 2015, October 2016, April 2017, and November 2017 were equally false. By way of another example, through the use of false and misleading screen-shots and wireframes which were electronically transmitted, Lyon and Moutzouros, on behalf of themselves and IGT, mispresented to Deru and TW *circa* January 2017 the status and features of Oranj in order to induce formation of the Joint Venture.

148. Put otherwise, Lyon, Moutzouros and IGT, either directly or indirectly, committed at least two predicate acts of racketeering activity starting as early as July or August 2016 and continuing down to the present time, including mail fraud and wire fraud, inasmuch as Lyon, Moutzouros and IGT have published materially false information, surreptitiously violated IGT's license with BAA and presumably transmitting false invoice payments, transmitted other false information in written documents either by mail or email, and so forth. Additional evidence of the full extent of Lyon, Moutzouros and IGT's mail fraud and wire fraud are likely be to found during the course of discovery. Moreover, Lyon, Moutzouros and IGT's actions have also interfered with interstate commerce and resulted in the theft of TW's trade secrets via fraudulent inducement of the Joint Venture.

149. The foregoing instances of wire and mail fraud misled TW and Deru and induced TW to enter into the Joint Venture forming the RICO enterprise, AA, through which Lyon, Moutzouros and IGT sought to and accomplished the purpose of defrauding Plaintiffs out of their legal and lawful property. In other words, Lyon, Moutzouros and IGT's predicate acts of racketeering activity advanced the RICO enterprise's purposes and enabled achievement of the same.

150. The series of related RICO predicates outlined above together demonstrate the existence or threat of continued criminal activity if not enjoined. On information and belief, Lyon, Moutzouros and IGT's conduct in violation of 18 U.S.C. § 1962 comprises these defendants' regular and ongoing way of doing business.

151. As principals of AA and/or the association-in-fact enterprise, Lyon, Moutzouros and IGT have also violated 18 U.S.C. § 1962(a) inasmuch as they have used or invested income from their racketeering activities to operate AA, which affects interstate commerce.

152. Likewise, Lyon and IGT have also violated 18 U.S.C. § 1962(b) inasmuch as they have acquired and controlled AA and/or the association-in-fact enterprise, which affects interstate commerce, resulting in injury to Plaintiffs.

153. Finally, Lyon, Moutzouros and IGT have also violated 18 U.S.C. § 1962(d) inasmuch as they have conspired together to violate the provisions of 18 U.S.C. § 1962(a)-(c).

154. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon, Moutzouros and IGT's conduct in violation of 18 U.S.C. § 1962. Absent injunctive relief pursuant to and in accordance with the

remedies set forth in 18 US.C. § 1964(a), Plaintiffs will continue to be irreparably damaged by Lyon, Moutzouros and IGT's conduct in violation of 18 U.S.C. § 1962.

155. Beyond irreparable harm, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial. Nevertheless, Lyon, Moutzouros and IGT's conduct in violation of 18 U.S.C. § 1962 proximately caused all such injuries and damage to Plaintiffs' business and/or property interests, including, *inter alia*, the loss of TW's intellectual property, consumer goodwill, and Plaintiff's reputations. Indeed, but for Lyon, Moutzouros and IGT's conduct in violation of 18 U.S.C. § 1962, Plaintiffs would not have sustained any of these injuries but did so as a direct result of Lyon, Moutzouros and IGT's conduct.

156. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are also entitled to threefold the damages sustained and the costs of suit, including attorneys' fees.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of UTAH CODE ANN. § 76-10-1601 *et seq.* (UPUAA)**
**(Against Lyon, IGT & Moutzouros)**

157. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

158. AA is a partnership, corporation, business, association or legal entity thereby comprising an enterprise within the meaning of UTAH CODE ANN. § 76-10-1602(1).

159. Lyon, Moutzouros and IGT are each individuals or entities capable of holding a legal or beneficial interest in property thereby each comprising a person within the meaning of UTAH CODE ANN. § 76-10-1602(3).

160. The joint actions of Lyon, Moutzouros and IGT alleged herein were carried out through AA, a separate and distinct legal entity constituting a UPUAA enterprise. And even if AA does not qualify as a UPUAA enterprise, Lyon, Moutzouros and IGT comprise a group of individuals forming an association-in-fact enterprise inasmuch as Lyon, Moutzouros and IGT have acted and associated together for a common purpose of engaging in a course of conduct to defraud Plaintiffs out of their legal and lawful property by fraudulently inducing the formation of AA. Moreover, a relationship exists between Lyon, Moutzouros and IGT inasmuch as, *inter alia*, Lyon and Moutzouros both work for IGT and are officers thereof. Moreover, Lyon is the CEO of AA, Moutzouros is either associated with AA via his employment with IGT or as an officer of AA, and IGT is a member of AA. Likewise, Lyon and Moutzouros have both acted in concert, combining their knowledge, skills, resources and labor to accomplish the purposes of IGT as well as their own. And the relationship between Lyon, Moutzouros and IGT has existed and will continue to exist for a sufficient length of time to permit Lyon, Moutzouros and IGT to accomplish the purpose of defrauding Plaintiffs as well as other industry participants, including BAA. Without this relationship, neither Lyon, Moutzouros nor IGT could have, on their own, accomplished AA's or the association-in-fact enterprise's purposes.

161. By virtue of making or contributing, either directly or indirectly, to unilateral decisions to (a) terminate Deru, (b) terminate other key employees of TW, (c) engage Lyon's personal legal counsel on behalf of AA notwithstanding a conflict of interest, (d) misclassifying capital contributions as loans, (e) attempting to convert the assets of TW contributed to AA, (f) utilizing AA as a vehicle or front to clandestinely wrest corporate opportunities of AA for IGT's

benefit, (g) allocating AA's resources and budget to the betterment and development of IGT at the expense of TW, (h) removing Deru's access to CRM databases of AA, (i) utilizing AA as a vehicle or front to clandestinely execute contracts on behalf of IGT, (j) merging the TradeWarrior software product and customers into MAX, (k) misrepresenting the development and features of Oranj in order to induce the formation of AA and, thereby, acquire TW's assets, trade secrets, knowhow, and other intellectual property, (l) making other false representations to induce formation of the JV in order to obtain TW's assets, and so forth, Lyon, Moutzouros and IGT conducted or participated, directly or indirectly, in the conduct of AA's and/or the association-in-fact enterprise's affairs.

162. In doing so, Lyon, Moutzouros and IGT violated at least UTAH CODE ANN. § 76-10-1603(3) by conducting the affairs of AA and/or the association-in-fact enterprise through a pattern of unlawful activity, including, but not limited to, (a) perpetrating a fraud on Deru, TW, the other owners of TW and other industry participants, such as BAA, through means of U.S. mail, wire and/or electronic transmissions affecting interstate commerce and (b) committing myriad additional unlawful acts within the meaning of UTAH CODE ANN. § 76-10-1602(4), including, but not limited to, theft by deception, unlawful dealing with property by a fiduciary, false or inconsistent material statements, false or inconsistent statements, false written statements, and so forth. Put otherwise, Lyon, Moutzouros and IGT, either directly or indirectly, engaged in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated, continuing, related

to AA or the association-in-fact enterprise, and occurring within the last five (5) years and continuing down to the present time.

163. The series of related unlawful acts outlined above together demonstrate the existence or threat of continued criminal activity if not enjoined. On information and belief, Lyon, Moutzouros and IGT's conduct in violation of UTAH CODE ANN. § 76-10-1603(3) comprises these defendants' regular and ongoing way of doing business.

164. As principals of AA and/or the association-in-fact enterprise, Lyon, Moutzouros and IGT have also violated UTAH CODE ANN. § 76-10-1603(1) inasmuch as they have used or invested income from their unlawful activities to operate AA.

165. Likewise, Lyon and IGT have also violated UTAH CODE ANN. § 76-10-1603(2) inasmuch as they have acquired and controlled AA and/or the association-in-fact enterprise, through a pattern of unlawful activity.

166. Finally, Lyon, Moutzouros and IGT have also violated UTAH CODE ANN. § 76-10-1603(4) inasmuch as they have conspired together to violate the provisions of UTAH CODE ANN. § 76-10-1603(1)-(3).

167. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon, Moutzouros and IGT's conduct in violation of UTAH CODE ANN. § 76-10-1603. Absent injunctive relief pursuant to and in accordance with the remedies set forth in UTAH CODE ANN. § 76-10-1605(10), Plaintiffs will continue to be irreparably damaged by Lyon, Moutzouros and IGT's conduct in violation of the UPUAA.

168. Beyond irreparable harm, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial. Nevertheless, Lyon, Moutzouros and IGT's conduct in violation of the UPUAA proximately caused all such injuries and damage to Plaintiffs' business and/or property interests, including, *inter alia*, the loss of TW's intellectual property, consumer goodwill, and Plaintiff's reputations. Indeed, but for Lyon, Moutzouros and IGT's conduct in violation of the UPUAA, Plaintiffs would not have sustained any of these injuries but did so as a direct result of Lyon, Moutzouros and IGT's conduct.

169. Pursuant to UTAH CODE ANN. § 76-10-1605(1) and (2), Plaintiffs are also entitled to twice their sustained damages and the costs of suit, including attorneys' fees.

**TWELFTH CLAIM FOR RELIEF**
**Promissory Estoppel (Against Lyon, IGT & AA)**

170. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

171. On January 26, 2018, the parties executed the Term Sheet. To the extent the Term Sheet is not a valid, binding, and enforceable contract inasmuch as it is vague or ambiguous and was only intended as a starting point for the parties to finalize a full length written settlement agreement, the Term Sheet and negotiations associated therewith comprises promises from Lyon / IGT / AA to Plaintiffs. And Lyon / IGT / AA have continued to make promises to Plaintiffs following execution of the Term Sheet, including promises to prepare a draft of the proposed full length settlement agreement and so forth.

172. Lyon / IGT / AA should reasonably expect that their promises embodied in and/or associated with the Term Sheet have caused Plaintiffs to forbear from taking certain actions to develop other business interests and opportunities while at the same time inducing Plaintiffs to take certain actions in an effort to finalize the parties' separation amicably.

173. In reliance on Lyon / IGT / AA's promises, Plaintiffs have, in fact, taken certain actions in an effort to finalize the parties' separation amicably at the expense of expending time and resources to develop other business interests and opportunities.

174. Plaintiffs are entitled to enforcement of Lyon / IGT / AA's promises, including, but not limited to, the assignment of all TW1 and TW2 clients, the migration of all TW1 and TW2 client records and client databases, the provision and assignment of all TradeWarrior code, Lyon / IGT / AA's cessation from use of the TradeWarrior name, mutual agreement as to the redirection of various web domains, full payment under the Term Sheet, mutual agreement as to media or other public statements, dissolution of AA, the release of former TW employee non-compete agreements, and so forth.

175. Plaintiffs stand ready, able and willing to perform their promises and are entitled to enforcement of Lyon / IGT / AA's promises.

176. It would be inequitable and unjust to allow Lyon / IGT / AA to avoid enforcement of their promises, particularly where Plaintiffs have suffered and will continue to suffer irreparable injury as a direct and proximate result of Lyon, IGT and AA's conduct, and where Lyon / IGT / AA already have and continue to enjoy significant benefits from the retention of assets under the Term Sheet without compensation to TW or Deru. Absent injunctive relief,

Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's conduct. More specifically, Plaintiffs have no adequate remedy at law and are entitled to enforcement of Lyon / IGT / AA's promises.

**THIRTEENTH CLAIM FOR RELIEF**
**Civil Conversion (Against Lyon, IGT & AA)**

177. Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

178. By virtue of Lyon / IGT / AA's material breaches of the Term Sheet and/or failure to follow through with its promises set forth therein or associated therewith, Lyon / IGT / AA have willfully interfered with, and/or wrongfully exercised control over, Plaintiffs' property, without lawful justification and in violation of Plaintiffs' rights in such property, thereby depriving Plaintiffs of the use and possession of such property.

179. The property Lyon / IGT / AA have converted includes at least, *inter alia*, the TW1 and TW2 clients and client data, duplicate copies and assignment of the TW1, TW2, TW3 code, and full payment of the monetary consideration bargained for in the Term Sheet.

180. Plaintiffs have suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Lyon, IGT and AA's acts of conversion. Absent injunctive relief, Plaintiffs will continue to be irreparably damaged by Lyon, IGT and AA's acts of conversion.

181. Beyond irreparable harm, Plaintiffs have suffered other injuries and damages which cannot yet be reasonably ascertained but will be proven at trial, including the full market value of the converted property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A. For a determination that Lyon, IGT and AA are in breach of their obligations under the Term Sheet;

B. For a determination that Lyon, IGT and AA are in breach of the implied covenant of good faith and fair dealing applicable to the Term Sheet;

C. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon / IGT / AA's breach of the Term Sheet;

D. Awarding Plaintiffs specific performance under the Term Sheet and requiring Lyon / IGT / AA to fully and immediately comply with their obligations under the Term Sheet and permanently enjoining Lyon / IGT / AA from taking actions contrary thereto;

E. For a determination that Lyon, IGT and AA have been unjustly enriched by virtue of receiving all TradeWarrior code, ancillary code related thereto, and MAX and requiring that Lyon, IGT and AA jointly and severally compensate Plaintiffs for receipt of these benefits;

F. For a determination that Lyon, IGT and AA have tortiously interfered with Plaintiffs' prospective and existing economic relationships;

G. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon / IGT / AA's acts constituting tortious interference;

H. For a determination that Lyon, Moutzouros, and IGT fraudulently induced Plaintiffs to enter the Agreement;

I. For a determination that Lyon, Moutzouros, and IGT, through negligent misrepresentation, unlawfully induced Plaintiffs to enter the Agreement;

J. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon, Moutzouros, and IGT's acts constituting fraudulent or negligent misrepresentations, multiplied by three times;

K. For a determination that, because of Lyon, Moutzouros, and IGT's fraudulent actions, IGT must forfeit all of its interests in AA, IGT must be removed as a member of AA, Lyon must be removed as a manager of AA, and that all of AA's assets and intellectual property revert to TW;

L. For a judicial declaration that the Agreement is either void *ab initio* and/or judicially rescinded owing to Lyon, Moutzouros, and IGT's fraudulent or negligent misrepresentations and ordering the return of all assets contributed to the JV by TW back to TW and those contributed by IGT back to IGT, and giving IGT and TW equal rights, title, and interest in and to MAX or that the Agreement has been superseded and rescinded by the Term Sheet and is, therefore, unenforceable;

M. For an alternative judicial declaration that that the Agreement remains in force, entitling Plaintiffs to exercise Section 15.4 thereof and purchase all of IGT and/or Lyon's interests in and to AA pursuant to the valuation and notice Plaintiffs previously provided to Lyon / IGT;

N. For a determination that Lyon and IGT breached their fiduciary duties of care, trust and loyalty to Plaintiffs;

O. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon/IGT's breaches of fiduciary duty, including appropriate punitive damages;

P. For a determination that Lyon, IGT, and Moutzouros violated one or more sub-sections of 18 U.S.C. § 1962 by, among other things, conducting the affairs of AA or another association-in-fact enterprise through a pattern of racketeering activity to defraud Plaintiffs and unlawfully take Plaintiffs' assets, corporate revenues, and business opportunities;

Q. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon, IGT, and Moutzouros racketeering acts conducted through AA or another association-in-fact enterprise, three times that amount, and the costs of suit, including attorneys' fees;

R. For a determination that Lyon, IGT, and Moutzouros violated one or more sub-sections of UTAH CODE ANN. § 76-10-1603 by, among other things, conducting the affairs of AA or another association-in-fact enterprise through a pattern of unlawful activity to defraud Plaintiffs and unlawfully take Plaintiffs' assets, corporate revenues, and business opportunities;

S. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the actual damages Plaintiffs have sustained as a result of Lyon, IGT, and Moutzouros unlawful acts conducted through AA or another association-in-fact enterprise, twice that amount, and the costs of suit, including attorneys' fees;

T. For a determination that Lyon, IGT and AA made promises to Plaintiffs which caused Plaintiffs to act or refrain from acting to Plaintiffs' detriment and requiring Lyon / IGT / AA to fully and immediately comply with their promised obligations;

U. For a determination that Lyon, IGT and AA converted Plaintiffs' property;

V. Awarding Plaintiffs their damages in an amount to be determined at trial, but in no event less that the market value of Plaintiffs' converted property;

W. For a determination that AA is to be immediately dissolved with all ancillary agreements, including employee non-competes, rescinded and void;

X. For preliminary and permanent injunctive relief consistent with, in addition to, or in lieu of other remedies prayed for herein, including enjoining that acts of AA, requiring AA to be dissolved, and requiring Lyon and IGT to return all TW assets and property to TW and Deru;

Y. For a determination that IGT, AA and Lyon must disgorge any and all TW income received by them, including all bank accounts, with interest;

Z. Awarding Plaintiffs' attorney's fees;

AA. Awarding Plaintiffs' lost profits since April 2017;

BB. For all compensatory, special, general, statutory, and punitive damages available against the Defendants in an amount to be proven at trial, along with pre and post-judgment interest thereon, but in no event less than $8,000,000; and

CC. For all such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby respectfully demand a jury trial on all such claims and causes of action, including any counterclaims or cross-claims hereafter asserted, so triable.

DATED this 4th day of April, 2018.

Respectfully submitted,

**KIRTON | MCCONKIE**

By: */s/ Joshua S. Rupp*
James T. Burton
Joshua S. Rupp
Mark W. Romney
*Attorneys for Plaintiffs*
*TradeWarrior, Inc. and Damon Deru*

4812-8707-9263, v. 5